## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 10-CV-23932-UU

TAMMY VALDES,

     Plaintiff,

v.

MIAMI-DADE COLLEGE,

     Defendants.

_____/

### ORDER ON MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment.   The Court has considered the Motion, the pertinent portions of the record, and is otherwise fully advised in the premises.

By way of background, on June 11, 2009, Defendant Miami-Dade College ("Defendant") suspended Plaintiff Tammy Valdes ("Valdes"), a part-time law enforcement instructor pending an investigation into alleged misconduct and, on October 21, 2009, Defendant terminated her employment.   Def. Mot. Summ. J. Ex. L, M.   On October 29, 2010, after issuance of the EEOC's notice of right to sue, Valdes sued Defendant, alleging four counts of gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII) and the Florida Civil Rights Act (FRCA) arising from her June 11, 2009 suspension.   Pl. Compl. (D.E. 1).   On March 7, 2011, Valdes filed an amended complaint, alleging eight counts of gender discrimination and retaliation under Title VII and the FRCA arising from both her June 11, 2009 suspension and her October 21, 2009

termination.[1]  Pl. Am. Compl. (D.E 23).   Defendant has moved for Summary Judgement on all of Valdes's claims as stated in her amended complaint.  Def. Mot. Summ. J. (D.E. 44).

## I. Facts

The material facts, viewed in the light most favorable to Valdes, unless otherwise noted, are as follows:

In 1996, Defendant hired Valdes to work as a part-time law enforcement instructor at Defendant's School of Justice ("SOJ").  Pl. Mot. in Opp'n to Summ. J. at 1.  During the first ten years of her employment, Valdes did not experience or complain of discrimination.  Pl. Compl. at 4; Depo. of Valdes at 53.

On August 24, 2006, Lieutenant Donald Diecidue ("Diecidue") sent a written memo to Thomas Hood ("Hood"), Director of Training at SOJ.  Def. Mot. Summ. J. Ex. B.  Diecidue worked part-time for SOJ as a training advisor and internal investigator.  Def. Mot. Summ. J. at 14.

The subject line of Diecidue's memo read "Disruption during an exam." Diecidue reported that several trainees had informed him that Valdes "became very angry and began using the (F) word and talking on her cell phone.  She made

---

[1] Count 1 alleges gender discrimination under Title VII (42 U.S.C. §2000(e)-2(a), *et seq*.) arising from the June 11, 2009 suspension.  Count 2 alleges retaliation under Title VII (42 U.S.C. §2000(e)-3(a)) arising from the June 11, 2009 suspension.  Count 3 alleges gender discrimination under the FRCA (*Fla. Stat.* §760.10(1)(a)) arising from the June 11, 2009 suspension.  Count 4 alleges retaliation under the FRCA (*Fla. Stat.* §760.10(7)) arising from the June 11, 2009 suspension. Count 5 alleges gender discrimination under (42 U.S.C. §2000(e)-2(a), *et seq*.) arising from the October 21, 2009 termination.  Count 6 alleges retaliation Title VII (42 U.S.C. §2000(e)-3(a)) arising from the October 21, 2009 termination.  Count 7 alleges gender discrimination under the FRCA (*Fla. Stat.* §760.10(1)(a)) arising from the October 21, 2009 termination.  Count 8 alleges retaliation under the FRCA (*Fla. Stat.* §760.10(7)) arising from the October 21, 2009 termination.

statements like, 'They have three f***ing T.As' and 'why do I have to be here.'" The trainees had been taking an exam, and were concerned that the alleged disturbance would negatively affect their scores.  Def. Mot. Summ. J. Ex. B.  After receiving Diecidue's report, Hood spoke with Valdes regarding the incident.  *Id.* Ex. C; Depo. of Hood at 29.

In September 2006, Shawnee Fross ("Fross") became the Program Manager for Firearms and Defense Tactics.  Def. Mot. Summ. J. Ex. G; Depo. of Fross at 9. Fross oversaw approximately thirty-two part-time instructors, including Valdes, and kept written notes of their performance.  Depo. of Fross at 14, 116.

On March 21, 2007, Fross prepared a written memo for Hood and  Dr. Donna Jennings ("Jennings"), the Director of the SOJ, describing ten incidents between September 13, 2006, and March 16, 2007, in which Valdes had failed to meet Fross's expectations.  Def. Mot. Summ. J. Ex. D.

Among other issues, Fross reported that, on several occasions, Valdes had not been "on the mat" to observe her trainees perform assigned exercises; that, on October 18, 2006, Valdes failed to attend a scheduled class and stated that Sergeant Steve Fagan ("Fagan") would teach in her place; that when Fross asked Fagan about the agreement, he denied having offered to cover Valdes's class; that, on December 7, 2006, Valdes "double booked herself" and had to cancel class; that, on December 11, 2006, Valdes cancelled class without notice; that, on March 13, 2007, Valdes was late for class; and that, on March 16, 2007, Valdes was absent for an exam that she was supposed to proctor (although Fross added here that Valdes later

informed her that she should not have been on the list to proctor the exam in the first place).  Def. Mot. Summ. J. Ex. D.

On March 28, 2007, Fross prepared a separate memo to Hood.  Def. Mot. Summ. J. Ex. G.   Fross explained that upon her assignment as Program Manger, her supervisors had informed her that the SOJ was having problems with instructors who were late and who left the mat during classes.  Fross stated that she then met with her instructors to address these matters.  *Id.*  Fross continued that on October 12, 2006, she verbally counseled Valdes for talking on her cell phone outside the gym for twenty-five minutes.  *Id.*  She also noted that on January 10, 2007, she gave Valdes a second verbal counseling after receiving complaints from other instructors that Valdes had left a testing area to talk on her cell phone. *Id.*

On May 21, 2007, Fross wrote Jennings and Hood another memo describing the same ten incidents that Fross detailed in the March 21 memo.   Def. Mot. Summ. J. Ex. H.  The May 21 memo identified the specific class of students affected in each of the alleged incidents.  Jennings had asked Fross for this additional information.  Depo. of Fross at 129.

On May 28, 2007, Valdes filed a written grievance with Defendant's Human Resources Division, alleging that she was being "treated differently" as a consequence of the "prior professional issues" that she had with Fross and Hood. Def. Mot. Summ. J. Ex. K.  Defendant never responded to Valdes's grievance.  Pl. Mot. in Opp'n to Summ. J. at 2.

4

On July 5, 2007, the SOJ issued Valdes a written reprimand.  Def. Mot. Summ. J., Ex. E.  The reprimand consisted of essentially another synopsis of the ten infractions that Fross had described to her supervisors in the March 21 and May 21 memos.[2]  It was the first time that Fross or anyone at the SOJ had disciplined Valdes in writing.[3]

Following the written reprimand, Fross continued to make written evaluations of Valdes.  On October 8, 2007, Fross recorded that Valdes had called to complain about the number of hours she was working.  Def. Mot. Summ. J. Ex. F; Depo. of Fross at 118-19.   On October 9, 2007, Fross recorded that Valdes left the mat for ten minutes to get coffee and disrupted another instructor's class with her "bitching."  Def. Mot. Summ. J. Ex. F.  On October 10, 2007, Fross recorded that Barbara Goodman, an instructor, informed her that a female African-American student had complained that a female Hispanic instructor had referred to the trainees as "idiots."  *Id*.  Fross verified that at the time of the alleged incident,

---

[2]In the May 21 memo, Fross gave different dates for two incidents.  The incidents that the March 21 memo described as occurring on March 13 and March 14 were now listed as occurring on March 14 and March 15, respectively.  In the July 5 reprimand, Fross used the original dates from the March 21 memo for these incidents.  In addition, the July 5 reprimand detailed Valdes's alleged failure to report to an evening firearms instruction class on March 15 as a separate incident, while the March 21 and May 21 memos included this incident as part of the incident that allegedly occurred on March 16.

[3] The parties dispute the role that Fross played in the written reprimand.  "The July 5, 2007 written reprimand," Valdes asserts, "was actually authored by [Clyde] Bridges [a college human resources official], Jennings and Hood," then "given to Fross, so that she could merely affix her signature to the document."  Pl. Mot. in Opp'n to Summ. J. at 3-4.  Defendant claims that Fross "prepared" the written reprimand, Def. Mot. Summ. J at 7, and, separately, that Fross "reviewed the written reprimand before it was given to Valdes" and corrected several discrepancies.  Def. Reply to Pl. Mot. in Opp'n to Summ. J. at 2.  Neither version of the facts concerning the reprimand is dispositive of any issue in the case.  The written record does make clear that the written reprimand bore the college's seal and Fross's signature.  Def. Mot. Summ. J. Ex. E.

Valdes was the only female Hispanic instructor on the mat.  Depo. of Fross at 122.

In her written notes, Fross added that, a month before the incident that Goodman

reported, Fagan, another instructor, had advised Fross to stop using Valdes as an

instructor because her negative tone and unprofessional language was detrimental

to student morale.  Def. Mot. Summ. J. Ex. F.

On June 1, 2009, Trainee Florencio informed Diecidue that his classmates

believed that Valdes had acted unprofessionally during the final exam.  Def. Mot.

Summ. J. Ex. I.  Diecidue then consulted with Fross, who requested that he meet

with the class.  *Id.*  During the meeting, one trainee told Diecidue that, on exam

day, Valdes asked him whether he had "taken [his] medication."  *Id.*  Others

reported observing Valdes talking on her cell phone during the exam.  *Id.*

Following the meeting, Fross directed the students to submit written statements to

Diecidue.  *Id.*  Fourteen students signed a statement written by their class leader,

Trainee Hobbs, in which it was alleged, among other things, that Valdes had used

SOJ's ammunition and a trainee's magazines while taking target practice at the

Miami Police Department's Medley Firearms Range.  *Id.*  When Diecidue alerted

Hood to this allegation, Hood asked Diecidue to conduct an investigation.  *Id.*

On June 11, 2009, Valdes complained to the Director of the SOJ, now Ronald

Grimming ("Grimming"), that the SOJ had not responded to her May 2007

grievance and that the SOJ was no longer in compliance with the contract that

Valdes had formed with former director Jennings.  Pl. Mot. Summ. J. at 6; Pl.

6

Compl. at 4.  Meanwhile, also on June 11, 2009, Hood sent Valdes a letter suspending her without pay pending the outcome of Diecidue's investigation.   Def. Mot. Summ. J. Ex. L.

On August 5, 2009, Diecidue questioned Valdes in the presence of her attorney.  Def. Mot. Summ. J. Ex. I.   During the interview, Valdes stated that she could not remember whether her cell phone had rung during the final exam, and denied having left the area during the exam.  She also denied making insensitive remarks to trainees.  *Id.*  Asked about the incident at the Medley Firearms Range, Valdes stated that the ammunition belonged either to her or her agency (Valdes worked full-time as a police officer), that the magazines did not belong to a trainee, and that she had permission to use the targets.  *Id.*

On or about August 17, 2009,  Diecidue submitted his final report.  The Court cannot be certain of the date because Diecidue dated the report April 17, 2009, which was two months before he began the investigation, and neither party corrected the clearly erroneous date.  *Id.*

On October 6, 2009, Valdes prepared an EEOC complaint, alleging that her ongoing suspension without pay was an act of gender discrimination.  In support of this allegation, Valdes claimed that "male instructors have been the subject of similar and more serious investigations; yet the male employees were not suspended while they were being investigated."  Def. Mot. Summ. J. Ex. N.

On October 21, 2009, Grimming sent Valdes a letter terminating her employment.  Def. Mot. Summ. J. Ex. M.  On November 9, 2011, Defendant received

a copy of Valdes's EEOC complaint.  Def. Mot. Summ. J. Ex. N.

## II.  Summary Judgment Standard

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  The Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion.

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial.  *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991

(5th Cir. 1981).[4] Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts then the court should deny summary judgment. *Impossible Elecs. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

---

[4] Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

9

### III. Valdes's Claims

Valdes alleges eight counts of gender discrimination and retaliation.  She asserts two counts of gender discrimination and two counts of retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e), *et seq*. Additionally, Valdes alleges two counts of gender discrimination and two separate counts of retaliation under the Florida Civil Rights Act (FCRA) *Fla. Stat.* §760.01, *et seq*.  The federal and state claims arise from the same set of facts.  Pl. Am. Compl.

The Court will first consider the federal claims, and will separate Valdes's gender discrimination claims from her retaliation claims.  After addressing Valdes's federal claims, the Court will then consider Valdes's state claims under the Court's supplemental jurisdiction provided by 28 U.S.C. §1441(c).

### (1) *Gender Discrimination Claims (Counts 1 & 5)*

#### *(A) Legal Standard*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to take adverse employment action against an employee on account of his or her sex. 42 U.S. C. § 2000(e)-(2)(a)(1).

Valdes's discrimination claims are based on circumstantial evidence.[5]  In *McDonnell Douglas Corp. v. Green*, the Supreme Court established the framework for

---

[5]  The record includes no direct evidence that Defendant took adverse employment action against her on the basis of her sex.  Nor does Valdes argue that such evidence exists. *See* Pl. Am. Compl., Pl. Resp. in Opp'n. Summ. J

assessing such claims. 411 U.S. 792 (1973)  Under *McDonnell Douglas*, a plaintiff must establish a prima facie case of discrimination.  *Id.* at 802.  To do so, the plaintiff may use evidence of better-treated "comparators" outside of his or her protected class. *Id.*  If the plaintiff makes a prime facie showing, "[t]he burden must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.*  Finally, should the employer-defendant provide a nondiscriminatory reason, the plaintiff has the opportunity to show that the employer's rationale is, in reality, a pretext masking the employer's discriminatory animus.  *Id.* at 804.[6]

Since *McDonnell Douglas*, numerous cases have tested the requirements of "comparator" evidence.  In determining whether the plaintiff and the "comparators" are similarly situated, the courts in the Eleventh Circuit "evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  *Cuevas v. Am. Express Travel Related Servs. Co.*, 256 Fed. Appx. 241, 243 (11 th Cir. 2007).  The *Cuevas* Court held further that it was bound to apply the "nearly identical" misconduct requirement that the Eleventh Circuit set out in *Maniccia v. Brown,*  171 F.3d 1364, 1368 (11th Cir. 1999) ( "[t]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing

---

[6] The Court is mindful to the nuances of the *McDonnell Douglas* framework when addressing motions for summary judgement.  "The *McDonnell Douglas* stages are simply a method of analysis for organizing a discrimination case in its initial stages to determine if a case has enough evidence to reach a jury in the first place. As the Supreme Court has explained, this framework is 'merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'"  *Farley v. Nationwide Mut. Ins. Co.,* 197 F. 3d 1322, 1333 (11 Cir. 1999).

apples with oranges.") *Id.*

      *(B) Discussion*

      Valdes claims that Defendant twice violated 42 U.S.C. §2000(e)-(2)(a)(1): by suspending her without pay in June 2009, Pl. Am. Compl. Count 1, and by firing her in October 2009, Pl. Am. Compl. Count 5.  As to both, Valdes supports her allegations of gender discrimination on grounds that Defendant treated "comparator" male employees better.  Pl. Am. Compl. at 5-7, 8-10, 16-7.

      Specifically, Valdes's complaint names ten male employees who were investigated for misconduct, yet, unlike Valdes, never suspended without pay during their investigations.  *Id.* at 5-7.  Beyond her complaint, Valdes provides no additional information on seven of the alleged "comparators."  Valdes blames this on defendant's failure to comply with her discovery request regarding the ten comparators.  Pl. Resp. in Opp'n  Summ. J., at 6.

      In response to Valdes's request for the personnel records of the ten comparators, Defendant produced more than 2600 pages of documents on those individuals.   Nevertheless, after this disclosure, the Magistrate Judge ordered Defendant to redouble its efforts to locate relevant documentation on the comparators.  Mag. Order D.E. 45.  In compliance with this order, Defendant conducted a search of its files and was unable to locate any additional documentation

on the comparators.  D.E. 49.[7]  Valdes simply has nothing to show that the Defendant has suppressed any information that would assist her in sustaining her claims. Therefore, the Court rejects her contention that her failure of proof is attributable to the Defendant.  It is well-established that the plaintiff bears the responsibility for showing that he or she was treated less favorably than other similarly- situated employees.  *See*, *e.g.*, *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Here, with respect to seven of the ten comparators, Valdes made no showing at all.

As for the remaining three comparators (Mitchell, Delgado, and Bruzinski), Valdes presents evidence of allegations that no reasonable fact-finder could consider to be "nearly identical" in "quality and quantity" to satisfy the legal standard set in *Maniccia, supra,* at 1368.

With respect to Mitchell, Valdes shows that Defendant was aware that the comparator (1) was under investigation by the city of Sweetwater for personal use of a city-issued gas card; and (2) asked a SOJ official to sell him a set of Goodyear tires that belonged to the school.  Pl. Resp. in Opp'n Summ. J. at 4; Ex. 2.  Even if true, these allegations are not "nearly identical" to the misconduct Valdes is alleged to have committed.  In Valdes's case, Defendant had evidence that Valdes was disrespectful toward a class of students during their June exam; no such charge was investigated in Mitchell's case.  Also Valdes was investigated for allegedly using

---

[7]Shortly after filing a sworn affidavit stating that no additional documents had been located, the officer who conducted the search discovered a single relevant document, which was entered into the record.  D.E. 56.  The document concerned comparator Dolan, who, according to the disclosure, was recommended for termination by a supervisor for teaching a "television type tactic." *Id*. Ex. A.

property that was not hers, while Mitchell was alleged only to have solicited the purchase of the SOJ's property.  The claim that Mitchell and Valdes are similarly situated because Mitchell was under investigation by the city of Sweetwater for using a city gas card for personal use also fails for the reason that Mitchell's alleged violation was investigated by a different employer.  Beyond this disqualifying difference, Mitchell's conduct concerned a city-issued gas card, while Valdes's involved allegedly using the SOJ's ammunition and targets and a trainee's magazines at the Medley Firearms Range.  Thus, to compare Valdes and Mitchell is to compare "apples and oranges,"  contrary to *Maniccia*, *supra*, at 1368.

Delgado and Brudzinski are also dissimilar to Valdes.  For Delgado, the alleged offense was fraternization because he was reported to be dating a trainee and otherwise socializing with the female trainees.  Pl. Resp. in Opp'n. Summ. J. Ex. 3.  By contrast, in the case of Valdes, Defendant had reports of disrespectful conduct toward students over several years as well as other incidents of misconduct.   For Brudzinski, Valdes points to false testimony under oath and "misuse of office" in connection with a shooting that involved another officer.  *Id*.  Although the one-page document that Valdes presents contains no further description of the allegations, it also shows that the SOJ was aware that the City of Miami Beach had investigated Brudzinski along with several other officers, and that the investigation had concluded that the charge was unfounded.  *Id*.  Given the differences in the alleged misconduct and the sources of the allegations, no reasonable fact-finder could conclude that Delgado and Brudzinski were "nearly identical" to Valdes yet treated more favorably.

14

*(C) Gender Discrimination Conclusion*

"We must think things, not words," Justice Oliver Wendell Holmes once said. The thing of Title VII cases is discrimination. As the Supreme Court noted in *Griggs v. Duke Power Co.*, "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications .... Discrimination preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." 401 U.S. 424, 430-1 (1971).

It the present case, Valdes has not made a prima facie case of gender discrimination. Her claims that she was wrongfully suspended without pay (Count 1) and wrongfully terminated (Count 5) in violation of Title VII rely solely on the three "comparators," whom Valdes has failed to show were similarly situated. Since no reasonable fact-finder could conclude that these comparators are "nearly identical" to Valdes, the Court finds no issues of material fact in Valdes's gender discrimination claims.

## (2) *Retaliation Claims (Counts 2 & 6)*

*(A) Legal Standard*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee because the employee has "opposed any practice made an unlawful employment practice by this subchapter, or because he has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. §2000(e)-(3)(a) (hereinafter "Opposition Clause").

The Eleventh Circuit has further explained that to establish a prima facie case a plaintiff must show: (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some casual relationship between the protected activity and the adverse action. *Arnold v. Tuskegee University*, 212 Fed. Appx. 803, 810 (11th Cir. 2006).

To establish a statutorily protected expression under the Opposition Clause, a plaintiff must show that he or she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Boyland v. Corrections Corp. of America*, 390 Fed. Appx. 973, 975 (11th Cir. 2010) (*per curiam*) (quoting *Little v. United Techs., Carrier Transicord Div.*, 103 F.3d 956, 960 (11th Cir. 1997). Moreover, the plaintiff must complain of the allegedly unlawful employment practice because he or she views it as discrimination. "Unfair treatment, absent discrimination based on race, sex, or national origin is not an unlawful employment practice under Title VII." *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).

As in gender discrimination actions, if the defendant articulates a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff, who must produce sufficient evidence for a reasonable fact-finder to conclude that the

16

defendants proferred reasons are pretexual.  *Chapman v. AI Transport*, 229 F. 3d 1012, 1037 (11th Cir. 2000) (en banc).  As characterized by the Eleventh Circuit, "the employer's burden in offering a non-discriminatory reason is 'exceeding light.'" *Meeks v. Computer Assocs.*, 15 3d 1013, 1021 (11th Cir. 1994).   The Supreme Court has clarified that when the burden shifts back to the plaintiff, "the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, (1981). "In a Title VII case," the *Burdine* Court explained, "the allocation of burdens ... is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Id*. at note 8.  Similarly, the Eleventh Circuit has made clear that "[p]rovided that the proferred reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Chapman, supra,* at 1030.  And the Court has further cautioned that Title VII plaintiffs who attempt to avoid a defendant's proferred reason for an adverse action impermissibly invite federal courts to "sit as a super-personnel department that reexamines an entity's business decisions.... Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id*.

   *(B) Discussion*

   Valdes claims that Defendant unlawfully retaliated against her on two occasions.  In Count 2, Valdes alleges that her suspension without pay in June 2009 was a response to the internal grievance that Valdes initially made in May 2007.  Pl. Am. Compl. at 10.  Additionally, in Count 6, Valdes alleges that Defendant's decision

to terminate her employment in October 2009 was a response to the EEOC complaint that Valdes had filed that month, as well as the 2007 internal grievance.  *Id.* at 18.

### (1) Count 2 – Retaliation against the internal grievance

On May 28, 2007, Valdes submitted a formal grievance to Defendant's Human Resources division.  Pl. Resp. Opp'n Summ. J. at 2.   Nowhere in the course of her six-page typed grievance did Valdes complain of gender discrimination.   Instead, the grievance gives a history of the personal conflict between Valdes and Fross.  Def. Mot. Summ. J. Ex. K.  To cite several examples:

"My character has been defamed as a result of a personal attack against my character and my abilities as a (sic) instructor in the presence of several other police officers by Manager Fross...."  *Id*. at 1.

"I have had my work hours dramatically reduced in Defensive Tactics since Manager Fross was hired as a full time employee and yet new less experienced instructors have been given extensive hours."  *Id.*

"Of all the instructors certified in the School of Justice to teach the TSA program, I was the only instructor Manager Fross did not enroll to attend the re-certification course."  *Id.* at 3.

"After I hung up with the vice principle I approached Manager Fross and informed her of the situation with my daughter.  I further informed her that I was contacting my daughters' father to pick her up from school and take her to the doctor's office.  Manager Fross responded, 'you should just go home.'"  *Id.*

18

"Since Manager Fross was employed as Program Manager for Defensive Tactics and Firearms my workload in defensive tactics has greatly diminished." *Id.*

"I proceeded to inform Director Jennings that Manager Fross was not hiring me for personal reasons with no justification." *Id.* at 4.

"I advised Mrs. Martinez [the campus president's assistant] that I had been advised of a rumor circulating through the college that Manager Fross had drafted a disciplinary document that she was planning on placing in my personnel file." *Id.*

"Manager Fross has defamed my character and integrity in the presence of my fellow co-workers.  She has systematically retaliated against me on a daily basis by singling me out and excluding only me from participating in and teaching for the TSA program for personal reasons."  *Id.* at 5.

"I have consulted with an attorney and if necessary am prepared in proceeding with filing charges with the E.E.O.C.  I truly hope that one person's personal issues with me do not have to escalate to that level."  *Id.*

These examples illustrate that there can be no genuine issue of fact that Valdes did not have "a good faith, reasonable belief" that Defendant was committing gender discrimination.  *See Little*, *Coutu*, *supra.*  True,  on the first page of the grievance Valdes listed the basis of her complaint as: "Defamation of Character, Retaliation, *Hostile Work Environment*, *Disparity in Treatment*."  *Id.* at 1 (emphasis added).  True, Valdes also stated later on that Fross's "harassment and intimidation

is ongoining and as such has created a hostile work environment." Id. at 5.  And true, Valdes threatened to file a complaint with the E.E.O.C (she did not file until after she was suspended without pay more than two years later).  *Id*.  But these isolated sentences do not change the indisputable fact that Valdes never stated that the personal issues between her and Fross had anything to do with Valdes's sex.  Instead, Valdes described a professional conflict between her and Fross.

In her grievance, Valdes traced the discord between her and Fross back to a course that both attended in 2004, during which Fross failed Valdes on the handcuffing technique portion of a test.  *Id*. at 1.  Fross miffed Valdes by mentioning Valdes's performance on this test a year later in front an entire training class.  *Id*.  Apparently, Fross made things even worse by telling numerous law enforcement officers that she thought Director Grimming had made a mistake when he allowed Valdes to redo the handcuffing techniques test that she had initially failed.  *Id*. at 2.  The relationship between Valdes and Fross took another turn for the worse when they both applied for a supervisory role at the SOJ.  Fross got the job, meaning that she was now Valdes's boss.  *Id*. at 2.

After Fross's promotion, the primary issue addressed by the grievance was the amount of work that Valdes was being assigned.  Valdes became upset when now Manager Fross informed her that the SOJ would no longer be offering TSA classes. (Valdes had recently become certified as a TSA instructor).  *Id*. at 2.  Valdes did not like it either that when she was given the opportunity to teach, Fross was there to monitor.  "The running joke in defensive tactics training," Valdes remarked in the

grievance, "was that if Manager Fross was in the gym it was because I was teaching."
*Id.* at 3. Valdes also complained about an isolated incident in which Fross gave her a
seemingly chilly response ("you should just go home" were Fross's precise words) after
Valdes took a phone call during a class that turned about to be an emergency call
from her daughter's school. *Id.* at 3.

For the most part, however, the gravamen of Valdes's 2007 grievance is work
hours, and ultimately, money– no small matter here in the Southern District of
Florida, or anywhere really, but a concern that is not be confused with sexual
harassment. Continuing, Valdes explains that in March 2007:

"I inquired [of Fross] as to why I was not being given any work based on my
selection on the defensive tactics choice list .... She replied that the reason was
because she had noticed that I was on the phone and that four of my friends had
complained about me. I immediately asked who the four instructors were and she
refused to inform me." *Id.*

Since Fross was unmoved by her request for more work, Valdes took the matter
to Director Jennings. In March 2007, Valdes informed Jennings "of all the events
listed in this grievance, and that fact that as a result of Manager Fross's personal
vendetta towards me I was suffering a financial loss." *Id.* at 4. Valdes reports,
tellingly, that Jennings saw the conflict as a "scheduling issue." *Id.* Understandably
disappointed with Jennings' response, which took Valdes two months and numerous
follow up phone calls to procure (another professional discourtesy that earns a place

in Valdes's grievance), Valdes then arranged a meeting, on May, 22, 2007, with Dean Mankee and Jennings.  *Id.*  The meeting broke down when the dean informed Valdes that they were meeting to discuss a "scheduling issue" and Valdes responded by indicating that she had requested the meeting to file a formal complaint against Fross.  *Id.*  A week later, Mrs. Martinez, the assistant to the campus president (with whom Valdes had now requested a meeting) directed Valdes to human resources, where she ultimately filed her May 29, 2007 grievance, narrating the events that led her to complain about Fross's treatment of her.

In the final two paragraphs of the grievance, Valdes summarizes the problems between her and Fross.  "She is abusing her position and the authority associated with it by drastically reducing the amount of hours she assigns me to teach in defensive tactics without just cause.  Her harassment and intimidation is (*sic*) ongoing and as such as created a hostile work environment..... Manager Fross displays disparity in treatment in her hiring practices.  Each day that Manager Fross is allowed to continue on her personal attack towards me financial damages continue to arise."  *Id.* at 5.

This recitation of Valdes's May 2007 grievance is relevant because Title VII's prohibition against retaliatory action by employers is limited to situations were the employee has "opposed any practice made an unlawful employment practice by this subchapter," or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. §2000(e)-(3)(a).

22

Since Valdes's May 2009 grievance was not made in an investigation, proceeding, or hearing, it must oppose some practice made unlawful by 42 U.S.C. §2000(e) to qualify as the kind of protected activity against which an employer cannot retaliate.  Despite failing on her sexual harassment claims, Valdes may still establish a prima facie claim if she makes a sufficient showing that Defendant retaliated against her for complaining about sex discrimination.  *See Lockett v. Choice Hotels Int'l, Inc.*, 3`5 Fed. Appx. 862, 868 (11th Cir. 2009).   This includes internal complaints, such as the grievance that Valdes filed in May 2009.  *See Hyde v. K.B. Home, Inc.*, 355. Appx. 266, 272 (11th Cir. 2009).

Still, Valdes's internal complaint must allege "some practice made unlawful" by 42 U.S.C. §2000(e).   42 U.S.C. §2000(e)-2(a)(1) and (2) provides a list of unlawful employment practices.  The common thread among the provisions is discriminatory action based upon an employee's or applicant's "race, color, religion, sex, or national origin." *See Id*.  §2000(e)-2(m), moreover, adds that except as otherwise provided, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

Valdes simply does not link her complaints about Fross and other supervisors at Miami-Dade to gender.  At most, Valdes asserts that she is being treated unequally, that her workplace environment is harsh, and that she has been the victim of harassment.  However, the "motivating factor" that Valdes repeatedly cites is not her sex, but Fross's personal animosity toward her.  Complaints of "my boss doesn't

like me," even if true, do not by themselves satisfy the requirements of Title VII's anti-retaliatory provisions. *See Allen v. Denver Public School Board*, 928 F2d 978, 985 (10th Cir. 1991) (ruling that a teacher's "personal" complaint against her principal contained "nothing on the face of the document to alert the reader that discrimination is being alleged" and therefore did not "satisfy the first element of the prima facie case."). *See also* 42 U.S.C. §2000(e) *et seq.* Because the 2007 grievance is essentially a list of workplace complaints unrelated to Title VII, there is no need to determine whether Defendant unlawfully retaliated against Valdes.

But even if Valdes's 2007 grievance could be viewed as protected activity, Valdes must still show a causal link between the grievance and her June 2009 suspension (Count 2) and her October 2009 termination (Count 6) in order to establish a prima facie case of retaliation.[8] *Maniccia*, *supra.* "We have previously held that, in the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation." *Drago v. Jeanne*, 453 F. 3d 1301, 1306 (11th Cir. 2006) (citing *Wascura v. City of South Miami*, 257 F. 3d 1238, 1248 (11th Cir. 2001). On the matter of the time lapse, Valdes maintains that Defendant suspended her immediately after she engaged in protected activity. This assertion rests on the fact that two days prior to the suspension, Valdes complained to Grimming that her 2007 complaint had never been addressed. Pl. Mot. Opp'n. Summ.

---

[8]Valdes relies on the 2007 grievance in both retaliation claims, however Count 6 also references Valdes's 2009 EEOC grievance.

J. at 15.   Depo. Hood at 83.   By resurrecting the 2007 grievance, Valdes was informing the school that it had failed to fix the problems of which she complained then.   Once again, those problems had to do with the lack of work and professional respect that Valdes believed she was receiving from Fross and other SOJ supervisors– not her gender.

Nevertheless, assuming that Valdes resurrected a protected grievance in June 2009, days before she was suspended without pay, she still cannot prevail.   This is because in the letter that Hood sent her on June, 11, 2009, Defendant articulated a legitimate reason for suspending Valdes pending the outcome of its investigation– namely, that it received "several complaints relating to [Valdes's] behavior while serving as a part-time Defensive Tactics Instructor." Def. Mot. Summ. J. Ex. L.

Furthermore, Defendant presents several facts entirely unrelated to Valdes's internal grievance in support of its decision to suspend her pending the outcome of its investigation.   First, it is undisputed that ten days prior to Hood's June 11, 2009 letter, Trainee Florencio informed Diecidue that Valdes had acted unprofessionally during an exam.   Def. Mot. Summ. J.  Ex. I.   Diecidue then spoke with Fross, who arranged for Diecidue to speak with the entire class.   *Id*.   At this gathering, the date of which is not indicated in the record, several students claimed that Valdes had acted unprofessionally.   *Id*.   After the discussion, Diecidue collected two written statements, both dated June 9, 2009.   *Id*.   One statement, which was prepared by Trainee Hobbs and signed by fourteen other trainees, alleged that Valdes took six to ten boxes of 40 caliber ammunition and two magazines, and proceeded to take target practice.   *Id*.

25

The other statement, a solo effort by Hobbs, claimed that on June 1, 2009, Valdes left the room while the trainees were taking an exam to take a call on her cell phone, and re-entered the testing room still talking on her phone. *Id*. Throughout the morning of June 11, 2009, the same date that Hood prepared the Valdes suspension letter, Diecidue interviewed numerous trainees from Valdes's class who repeated the allegations that Valdes had been disrespectful toward students on several occasions, and had used ammunition, magazines, and targets that did not belong to her. *Id*. The fact that Diecidue was actively investigating Valdes lends credence to Defendant's assertion that Valdes was suspended without pay as a result of an ongoing investigation. In sum, considering the numerous allegations against Valdes in Diecidue's investigation, no reasonable fact-finder could find that Defendant has not satisfied its "exceedingly light" burden of proferring a legitimate reason for suspending Valdes. *See Meeks, supra*.

Since Defendant articulates a legitimate rationale for suspending her without pay, the burden now shifts back to Valdes to show that Defendant's reasons are pretextual. Valdes makes several claims in rebuttal. First, she argues that in the wake of her 2007 grievance, Defendant sought out and constructed evidence of Valdes's suspect work performance. Pl. Resp. in Opp'n. Summ. J. at 15. However, the undisputed evidence is that Fross had begun circulating memoranda on Valdes's work performance two months prior to Valdes's 2007 grievance. Def. Mot. Summ. J. Ex. D, G, H. Moreover, Defendant later investigated and suspended Valdes in June 2009 only after the students approached Diecidue with information about Valdes's

recent conduct.  *Id*. Ex. I.  There is simply nothing in the record that indicates that Defendant ever investigated Valdes, formally or informally, as a result of a complaint that Valdes filed.  Thus, Valdes's first rebuttal argument fails as a matter of undisputed fact.

Additionally, Valdes raises the close proximity between her decision to inquire into her 2007 grievance and her suspension.  Pl. Resp. in Opp'n. Def. Mot. Summ.  J. at 15.  It is uncontested that Defendant took adverse action against Valdes only two days after she complained that the 2007 internal grievance remained unresolved.

Temporal proximity may be sufficient to show the casual connection prong of a Title VII plaintiff's prime facie case.  *Bass v. Bd of County Comm'rs*, 256 F. 3d 1095, 1119 (11th Cir. 2001).  However, reasserting temporal proximity does not satisfy the plaintiff's responsibility to rebut a defendant's proffer of a legitimate reason for the adverse action.  In *Farley v. Nationwide Mut. Ins. Co.,* 197 F. 3d 1322 *(*11 th Cir. 1999), the Eleventh Circuit reversed the district court's decision to grant defendant Nationwide's summary judgment on a retaliation claim after the trial court determined that plaintiff Farley had not met the casual connection prong of the required prima facie showing.  The Eleventh Circuit disagreed and ruled that the two month gap between Farley's complaint and termination was "sufficiently proximate to create a casual nexus for purposes of establishing a prima facie case."  *Id*., at 1337.

Proceeding through the *McDonnell Douglas* stages, the Court next acknowledged that Nationwide had proferred a legitimate reason for the adverse employment action.  *Id*.  Significantly, when it finally considered Farley's rebuttal

evidence, the Court never referred back to the temporal proximity between Farley's complaint and termination. Instead, the Court relied upon separate record evidence that Farley introduced, specifically numerous performance evaluations and testimony about the verbal abuse and disparate treatment that he received. "This evidence," the Court remarked, "created a genuine issue of fact as to the credibility of Nationwide's proffered reason." *Id*.

In the present case, since the Defendant has given a legitimate reason for suspending Valdes, namely the students' allegations, it is the plaintiff's burden to show that Defendant's stated rationale was pretextual. *McDonnell Douglas*, *supra*, at 804. Although Valdes may claim that the temporal proximity between her complaint and suspension is sufficient to show casual connection, temporal proximity by itself does not create a triable issue of fact under the same analysis that the Court used in *Farley*, *supra*. Put differently, by reiterating the timeline of her June 2009 complaint and immediate suspension, Valdes does not meet "head on" Defendant's reason for suspending her and "rebut it." *Chapman*, *supra*, at 1030.

Finally, Valdes claims, completely illogically, that Defendant's intent to retaliate is evidenced by the fact that Defendant "communicated her alleged disciplinary violations to her then full-time employer," the Golden Beach police department. *Id*. at 16. But Hood's deposition testimony, on which this argument is based, tells a different story that is not susceptible to an interpretation favoring Valdes's claim. *Id*. Asked whether he was aware of Grimming's conversations with Golden Beach's chief of police, Hood explained that he was present when Grimming

28

made the phone call.  Hood continued: "He did it out of courtesy," he said of the call,

"not only to Jim Skinner [the chief of police] but also to [Valdes].  His questions were

really good ones in the sense that maybe [Valdes] had a legitimate reason for being

[at the firing range]– maybe she was the firearms instructor for the City of Golden

Beach– and that's the question that [Grimming] posed to Chief Skinner."  Depo. of

Hood at 51.  Contrary to Valdes's contention, the record shows conclusively that

Grimming made the call to be certain that Valdes's conduct at the gun range was not

related to her official duties elsewhere.

### *Count 2 Conclusion*

Valdes's claims of unlawful retaliation under Title VII attempt to link Valdes's

2007 internal grievance with her 2009 suspension.  The linkage fails for several

reasons.  No reasonable fact-finder could conclude that Valdes's internal grievance

constitutes "protected activity" because it does not complain of gender-based

discrimination.   But even assuming that the internal complaint was a "protected

activity," and further granting that Valdes's reassertion of the grievance in June 2009

defeats any argument that the two-year laps between the initial complaint and the

suspension severs causation, Defendant has sufficiently shown that the student

allegations that triggered Valdes's investigation were a legitimate, non-retaliatory

reason for suspending her without pay.  Further, the record does not support any of

Valdes's contentions that Defendant's proferred rationale for suspending her was in

fact pretexual.

### *(2) Count 6– Retaliation in response to the EEOC*

*Complaint*

In the remaining retaliation claim (Count 6) under Title VI, Valdes reasserts the allegation that the Defendant unlawfully retaliated against her as a consequence of the complaints that she made internally.  Pl. Am. Compl. at 18.  Unlike Count 2, Count 6 also alleges that Valdes's termination occurred as a result of the EEOC complaint that Valdes filed in October 2009.  *Id.*

To establish the casual link between her complaint and the adverse employment action that later occurred, Valdes submits her October 6, 2009, EEOC complaint, which alleges that her current suspension is the result of gender discrimination.  Unquestionably, the EEOC complaint is a protected grievance.  Def. Mot. Summ. J. Ex. N.   On October 21, 2009, two weeks after Valdes made her EEOC complaint, Defendant informed her by letter that she was terminated.  *Id*. Ex. M.

In response, Defendant submits the copy of Valdes's complaint that the school received from the EEOC.  The school's copy of Valdes's complaint shows that although Valdes swore to the complaint before a notary public on October 6, the complaint was not received by the EEOC until October 20.  Significantly, it was not until November 9 that the complaint finally reached Defendant, as evidenced by the date stamp indicating receipt on the school's copy of the complaint.  Def. Mot. Summ. J. Ex. N. Accordingly, Defendant claims that it could not have acted in retaliation to the EEOC complaint because it was not aware of the complaint until three weeks after it terminated Valdes.

To make a prima facie case of retaliation, an employee must show that "the decisionmakers were aware of the protected conduct." *Gupta v. Florida Bd. of Regents*, 212 F. 3d 571, 590 (11th Cir 2000). "It is not enough not enough for a plaintiff to show that someone in the organization knew; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression." *Bass, supra*, at 1119. Valdes has not met this burden because she offers no evidence that any employee of Defendant who was associated with the adverse action had received a copy of the EEOC complaint prior to her termination date.

Furthermore, even if the Court believed that, absent any additional evidence, Defendant was aware of the EEOC before Valdes was terminated, there is nothing in the record to rebut Defendant's proferred reason for firing Valdes. On this score, Bettie Thompson, Vice Provost for Human Resources for Defendant, submitted a sworn statement, in which she took ownership of the October 2009 decision to fire Valdes. Thompson gave as reasons Grimming's recommendation that Valdes be fired in addition to her knowledge that as far back as 2006, Valdes had been counseled for being disrespectful to students. Def. Mot. Summ. J. Ex. J. Since Valdes has offered no evidence to show that Thompson's reasons were pretextual, even if we assumed that Thompson were aware of the EEOC complaint, we find no question of material fact exists on the question of whether Defendant unlawfully retaliated against Valdes by firing her. *See McDonnell Douglas, supra.*

### *(3) The State Law Claims*

In addition to alleging that Defendant violated the sex discrimination and anti-

retaliation provisions of Title VII, Valdes makes out claims under the Florida Civil Rights Act (FRCA) arising from the same set of facts.  *Fla. Stat.* §760.01, *et seq.* Counts 3 and 7 allege, respectively, that Defendant violated the FRCA's prohibition in §760.10(1)(a) against gender discrimination when it suspended Valdes in June 2009, and when it terminated her employment in October 2009.[9]  Pl. Am. Compl. at 12-3, 20-1.  Counts 4 and 8 allege, respectively, that Defendant violated the FRCA's anti-retaliation provision in §760.10(7) when it suspended Valdes in June 2009, and when it terminated Valdes's employment in October 2009.[10]  Pl. Am. Compl at 14-5, 21-3.

In  *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998), the Eleventh Circuit held that "decisions construing Title VII guide the analysis of claims under the Florida Civil Rights Act."  As we do in the present case, the *Harper* Court also considered matching claims that were made separately under the gender discrimination and anti-retaliation sections of Title VII and the FCRA, respectively.  *Id.*  The Court explained that "because the Florida act was patterned after the Title VII," both the gender discrimination claims and the retaliation

---

[9] §760.10(1) provides that "[i]t an unlawful employment practice for an employer: (a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.

[10] §760.10(7) provides that "[i]t is an unlawful employment practice for an employer, an employment agency, a joint labor-management committee, or a labor organization to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section."

claims arising under the FRCA would be assessed according to the legal framework that applies to gender discrimination and retaliation claims brought under Title VII.  *Id*. at 1387.

28 U.S.C. §1441 (c) authorizes the Court "to determine all issues" in cases involving federal and state claims.  Here, the Court will exercise its supplementary jurisdiction over Valdes's four claims brought under the FRCA.  Following *Harper*, *supra*, the Court further rules that Valdes cannot prevail on any of her claims brought under the FRCA because, for the reasons discussed herein, she cannot prevail on any of her claims arising from the same facts brought under Title VII.  As *Harper* emphasized: "[n]o Florida court has interpreted the [FRCA] to impose substantive liability where Title VII does not." *Id*.  Since no reasonable fact-finder could find Defendant liable on these facts under Title VII for gender discrimination or retaliation, no reasonable fact-finder, relying on the clear holding in *Harper*, could find the Defendant liable under the FRCA for the same claims arising from the same alleged facts.

### *Case Summary*

For the reasons herein discussed, the Court finds no issue of material fact on either of Valdes's gender discrimination claims under Title VII.  Similarly, the Court funds no issue of material fact on either of Valdes's retaliation claims under Title VII.  Applying the same cases that guided our analysis of Valdes's claims under Title VII to her claims under the FRCA, the Court finds that no issue of material fact exists as to any of her gender discrimination or retaliation claims brought under Florida law.

Accordingly, it is hereby ORDERED AND ADJUDGED that

Defendant's Motion for Summary Judgement is GRANTED.

DONE AND ORDERED in Chambers at Miami, Florida, this 5th day of

October, 2011.

_____

UNITED STATES DISTRICT JUDGE

copies provided: counsel of record